Adam M. Romney (SBN 261974)
Susan M. Benson (SBN 146837) *(Of Counsel)*
Jordan B. Everakes (SBN 251371)
GROTEFELD HOFFMANN LLP
5535 Balboa Blvd., Ste. 219
Encino, California 91316
Telephone: (747) 233-7150
Facsimile: (747) 233-7143

William J. Hoffmann *(pro hac vice to be filed)*
GROTEFELD HOFFMANN LLP
407 South Third Street, Suite 200
Geneva, Illinois 60134
Telephone: (312) 551-0200
Facsimile: (630) 262-5023

Attorneys for Plaintiffs

# UNITED STATE DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY; STATE FARM FIRE AND CASUALTY COMPANY; STATE FARM GUARANTY INSURANCE COMPANY; STATE FARM INDEMNITY COMPANY; STATE FARM COUNTY MUTUAL INSURANCE COMPANY OF TEXAS; STATE FARM GENERAL INSURANCE COMPANY; HIROAD ASSURANCE COMPANY; GAINSCO, INC.;<br><br>         Plaintiffs,<br><br>   vs. | Case No.: 8:23-cv-00981<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>DEMAND FOR JURY TRIAL |

1

COMPLAINT FOR DAMAGES

|   |   |
|---|---|
| HYUNDAI MOTOR AMERICA, | ) |
| HYUNDAI MOTOR COMPANY, KIA | ) |
| AMERICA, INC., KIA | ) |
| CORPORATION; | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

NOW COMES Plaintiffs **STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY; STATE FARM FIRE AND CASUALTY COMPANY; STATE FARM GUARANTY INSURANCE COMPANY; STATE FARM INDEMNITY COMPANY; STATE FARM COUNTY MUTUAL INSURANCE COMPANY OF TEXAS; STATE FARM GENERAL INSURANCE COMPANY; HI-ROAD ASSURANCE COMPANY; GAINSCO, INC.** (hereinafter collectively referred to as "Plaintiffs and/or STATE FARM") by and through their attorneys GROTEFELD HOFFMANN, LLP and for their Complaint against all named Defendants, alleges that at all relevant times herein on information and belief as follows:

## THE PARTIES

1. Plaintiff, **State Farm Mutual Automobile Insurance Company**, at all pertinent times herein, is a corporation organized and existing under the laws of the State of Illinois, with a principal place of business located at One State Farm Plaza, Bloomington, Illinois 61710 and which, at all times material hereto was engaged in the business of issuing policies of insurance. This entity sues in its own name and on behalf of various wholly owned subsidiaries/entities to be identified at a later time.

2. Plaintiff, **State Farm Fire and Casualty Company**, at all pertinent times herein, is a corporation organized and existing under the laws of the State of

Illinois, with a principal place of business located at One State Farm Plaza, Bloomington, Illinois 61710 and which, at all times material hereto was engaged in the business of issuing policies of insurance.

3. Plaintiff, **State Farm Guaranty Insurance Company**, at all pertinent times herein, is a corporation organized and existing under the laws of the State of Illinois and which, at all times material hereto was engaged in the business of issuing policies of insurance.

4. Plaintiff, **State Farm Indemnity Company**, at all pertinent times herein, is a corporation organized and existing under the laws of the State of Illinois and which, at all times material hereto was engaged in the business of issuing policies of insurance.

5. Plaintiff, **State Farm County Mutual Insurance Company of Texas**, at all pertinent times herein, is a corporation organized and existing in the state of Texas and has a principal place of business in Texas and which, at all times material hereto was engaged in the business of issuing policies of insurance.

6. Plaintiff, **State Farm General Insurance Company**, at all pertinent times herein, is a corporation organized and existing under the laws of the State of Illinois, with a principal place of business located at One State Farm Plaza, Bloomington, Illinois 61710 and which, at all times material hereto was engaged in the business of issuing policies of insurance.

7. Plaintiff, **HiRoad Assurance Company**, at all pertinent times herein, is a corporation organized and existing under the laws of the State of Illinois, with a principal place of business in Illinois, at all times material hereto was engaged in the business of issuing policies of insurance.

8. Plaintiff, **GAINSCO, Inc.**, at all pertinent times herein, is a corporation organized and existing in the state of Texas and has a principal place of business in Texas and which, at all times material hereto was engaged in the

business of issuing policies of insurance.

9. Defendant **Hyundai Motor America** ("HMA**")** is a California corporation with its principal place of business located at 10550 Talbert Avenue, Fountain Valley, CA 92708. HMA engages in business throughout the United States, including in this judicial district.

10. Defendant **Hyundai Motor Company** ("HMC") is a South Korean corporation. HMC is the parent corporation of HMA.

11. Defendant HMC, through its various related corporate entities and subsidiaries, designs, manufactures, assembles, markets, distributes and sells Hyundai automobiles in this judicial district and multiple other locations in the United States.

12. Defendant HMA is HMC's U.S. sales and marketing division, and it manages and oversees the sales and other operations of HMC across the United States. HMA distributes Hyundai vehicles and sells these vehicles through its network of dealerships. Money received from the purchase or lease of a Hyundai vehicle from a dealership flows from the dealer to HMC and HMA.

13. Upon information and belief, Defendant HMC and Defendant HMA work cooperatively and communicate with each other on all aspects of the Hyundai products which HMC and HMA distribute and sell within the United States.

14. Upon information and belief, Defendant HMA and Defendant HMC cooperate and jointly make all decisions regarding the distribution, service, repair, installation, and incorporation of anti-theft and other safety devices and designed components, including any decisions relating to the failure to provide such protections and anti-theft devices in Hyundai vehicles, as they relate to the defect in the Hyundai vehicles addressed in this action.

15. Upon information and belief, Defendants HMA and HMC cooperated and jointly developed all pertinent marketing materials regarding the

differences between trim packages and warranty booklets sold and distributed with the Hyundai vehicles that are the subject of this action.

16. Upon information and belief, Hyundai dealers sold certain 2011-2022 Hyundai vehicles equipped with traditional 'insert-and-turn' steel key ignition systems (hereinafter the "Subject Vehicles").

17. Upon information and belief, the Hyundai dealers that sold the Subject Vehicles to Plaintiffs' insureds are expressly authorized by HMA and HMC to offer express warranties to purchasers of Hyundai vehicles, directly from HMA and HMC.

18. The Hyundai dealers that sold Subject Vehicles to Plaintiffs' insureds were acting as HMA and HMC's agents with actual and apparent authority in selling the Subject Vehicles to Plaintiffs' insureds.

19. Defendant **Kia America, Inc**. ("KA") (formerly Kia Motors America, Inc.) is a California corporation with its principal place of business at 111 Peter Canyon Rd., Irvine, CA 92606. KA engages in continuous and substantial business throughout the United States, including in this judicial district.

20. Defendant **Kia Corporation** ("KC") is a South Korean corporation. KC is the parent corporation of KA.

21. Defendant KA is an automobile design, manufacturing, distribution, and service corporation doing business within the United States. Furthermore, Defendant KA designs, develops, manufactures, distributes, markets, sells, leases, warrants, services, and repairs passenger vehicles, including certain 2011-2022 Kia vehicles (hereinafter included in the term "Subject Vehicles") equipped with traditional 'insert-and-turn' steel key ignition systems."

22. Defendant KA is KC's U.S. sales and marketing division, and it manages and oversees sales and other operations of KC across the United States. KA distributes Kia vehicles and sells these vehicles through its network of

dealerships. Money received from the purchase or lease of a Kia vehicle from a dealership flows from the dealer to KC and KA.

23. Upon information and belief, Defendant KC and Defendant KA cooperate and jointly make all decisions regarding the distribution, service, repair, installation, and incorporation of anti-theft and other safety devises and designed components, including any decisions relating to the failure to provide such protections and anti-theft devices in Kia vehicles, as they relate to the defect in the Kia vehicles at issue in this action.

24. Upon information and belief, Defendants KA and KC cooperated and jointly developed all pertinent marketing materials regarding the differences between trim packages and warranty booklets for the Kia vehicles that are the subject of this action.

25. Upon information and belief, Defendant KC and Defendant KA work cooperatively and communicate with each other on all aspects of the Kia products which KC and KA distribute and sell within the United States.

26. Upon information and belief, the Kia dealers that sold Subject Vehicles to Plaintiffs' insureds hold themselves out, with KA and KC's express and implied permission, as associated with KA and KC to sell KA and KC's vehicles on KA and KC's behalf.

27. For instance, the Kia dealers that sold the Subject Vehicles to Plaintiffs' insureds are expressly authorized by KA and KC to offer express warranties to purchasers of Kia vehicles, directly from KA and KC.

28. The Kia dealers that sold Subject Vehicles to Plaintiffs' insureds were acting as KA and KC's agents with actual and apparent authority in selling the Subject Vehicles to Plaintiffs' insureds.

29. As of the end of 2021, KC's largest shareholder is HMC, which holds 33.88 percent of KC's stock.

30. HMA and HMC are collectively referred to in this complaint as "Hyundai" unless identified separately.

31. KA and KC are collectively referred to in this complaint as "Kia" unless identified separately.

32. HMA, HMC, KA, and KC are collectively referred to in this complaint as "Defendants" unless identified separately.

## JURISDICTION AND VENUE

33. The Court has general personal jurisdiction over Defendants because they conduct substantial business in California, and they intentionally and purposefully placed the Subject Vehicles into the stream of commerce within California and elsewhere in the United States. Further, HMA and KA are headquartered in California.

34. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) as the amount in controversy exceeds this Court's jurisdiction, exclusive of interest and costs, the Plaintiffs are entities of a state different from each of the named defendants.

35. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the Plaintiffs are domiciled in different states than all Defendants and the amount in controversy is in excess of $75,000, exclusive of interest and costs.

36. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), as all defendants do substantial business in this judicial district, including the selling of the vehicles at issue.

## FACTUAL ALLEGATIONS

37. Between 2011 and 2022, Defendants sold vehicles equipped with traditional 'insert-and-turn' steel key ignition systems, and without immobilizers

that, when properly designed and installed, have been proven to deter auto theft. Unlike other manufacturers, the Subject Vehicles manufactured by the Defendants are not equipped with an "immobilizer," or any other comparable anti-theft feature or design element that will prevent the car from being started, driven forward, and steered. This security vulnerability makes the Defendants' vehicles dangerously easy to steal.

38. Effective July 28, 2010, the U.S. Department of Transportation, National Highway Traffic Safety Administration, adopted and enacted Federal Motor Vehicle Safety Standard ("**FMVSS**") 114, which states: "The purpose of this standard is to decrease the likelihood that a vehicle is stolen … This standard applies to passenger cars …," which required vehicle manufactures to incorporate anti-theft security features within vehicles distributed and sold in the U.S.

39. Electronic transmitters and receivers called "immobilizers" are utilized to comply with the United States' regulatory requirements to prevent the theft of vehicles by nearly all vehicle manufacturers within the U.S. and worldwide, as a standard within the industry. Immobilizers, as incorporated and designed by other vehicle manufactures, have been proven to deter auto theft.

40. Immobilizers are security, and specifically anti-theft, devices installed within vehicles and in relation to the engine that contain a receiver. Immobilizers prevent activation and forward self-mobility of vehicles if the receiver does not detect a corresponding, paired transponder, which is located in the vehicle's key. If the receiver within the immobilizer does not detect the transponder within the vehicle's key nearby, the engine will not start, and the vehicle will not achieve forward self-mobility, even if the ignition is turned.

41. The United States does not specifically require the use of immobilizers. Rather, immobilizers are one method, as adopted by many manufacturers as an industry standard, to comply with the requirements of FMVSS

114. The National Highway Traffic Safety Administration (NHTSA) has issued an opinion letter confirming that vehicles with immobilizers satisfy FMVSS 114 because the immobilizer prevents the normal activation of the vehicle's engine and forward self-mobility of the vehicle when the vehicle's key is removed. U.S. Nat'l Highway Traffic Safety Admin., Opinion Letter (Sept. 24, 2004), https://www.nhtsa.gov/interpretations/gf005229-2.

42. Even if a vehicle does not contain an immobilizer, it must still comply with the requirements of Federal Motor Vehicle Safety Standard 114. Although a lack of an immobilizer alone does not violate FMVSS 114, vehicles must incorporate sufficient anti-theft features or design elements that meet the minimum standards defined by FMVSS 114.

43. In the United States, immobilizers have become an industry standard anti-theft protection device, and nearly all of Defendants' major competitors include immobilizers as standard anti-theft technology in their vehicles to comply with FMVSS 114.

44. Kia and Hyundai have refused to include immobilizers as a standard anti-theft technology across their entire line of vehicles. Although Kia and Hyundai included immobilizers as anti-theft protection in certain of their vehicles, they did not provide purchasers of other vehicles, including the Subject Vehicles, with either the anti-theft protection provided by immobilizers, or with other FMVSS 114-compliant anti-theft features or design elements, unless the consumers also purchased expensive trim packages which included luxury features having nothing to do with vehicle safety requirements; or, if anti-theft features or design elements were provided, they failed to fulfill the functions or achieve the results required by FMVSS 114.

45. Further, Kia and Hyundai did not include any other features or design elements on the Subject Vehicles that would prevent those vehicles from being

easily stolen or otherwise bringing those vehicles into compliance with FMVSS 114.

46. In short, Kia and Hyundai have violated federal law by continually selling certain vehicles without anti-theft protection sufficient to satisfy federal regulations intended to protect life and property. In order for consumers to obtain these protections in certain Kia and Hyundai vehicles, Kia and Hyundai forced the consumer to pay thousands of dollars extra for trim packages which include anti-theft protection.  In so doing, Kia and Hyundai improperly made the inclusion of anti-theft protection dependent upon the purchaser's ability to pay for luxurious trim package features.

47. On information and belief, Defendants have long been aware of the anti-theft benefits attendant to making immobilizers a standard feature on their vehicles based on the immobilizer mandates of other countries in which Kia and Hyundai sell their vehicles. In fact, Kia and Hyundai sell virtually identical vehicles as the Subject Vehicles—*except equipped with immobilizers*—in other countries with immobilizer requirements. Nevertheless, Kia and Hyundai have failed to include as "standard" the same immobilizer technology for all vehicles sold within the U.S. Nor have Kia and Hyundai equipped the Subject Vehicles with any alternative anti-theft feature or design element that would comply with FMVSS 114.

48. Given the ease with which the Subject Vehicles can be stolen, the United States has experienced a marked increase in reported car thefts of the Subject Vehicles.

49. In recent years, this trend has been accelerated by viral TikTok videos and videos on other popular social media platforms revealing the lack of an immobilizer in the Subject Vehicles, and further showing how to steal a Subject Vehicle by doing nothing more than bypassing the key slot and turning the ignition

with a common USB cable (or any similarly shaped metal object) to start the engine.[1]

50. The viral videos offer step-by-step instructions on how to steal Subject Vehicles and encourage viewers to steal Subject Vehicles as part of the "Kia Challenge." Videos created in response to the Kia Challenge show persons stealing the Subject Vehicles and causing damage thereto. These incidents have resulted in personal injuries, deaths and significant property damages related to the thefts.

51. Additionally, when the Subject Vehicles are stolen due to the lack of any anti-theft features or design elements sufficient to comply with FMVSS 114, other property is often stolen and damaged in the process, such as any personal property that may have been within the vehicles at the time of the theft.

52. By failing to equip the Subject Vehicles with sufficient anti-theft features or design elements to prevent the theft of Subject Vehicles in the manner described herein this pleading, the Defendants have violated federal law as the Subject Vehicles fail to comply with Federal Motor Vehicle Safety Standard ("**FMVSS**") 114, which requires: "Each vehicle must have a starting system which, whenever the key is removed from the starting system prevents: (a) The normal activation of the vehicle's engine or motor; and (b) Either steering, or forward self-mobility, of the vehicle, or both." 49 CFR § 16 571.114.

53. The Subject Vehicles do not comply with FMVSS 114 because the Vehicles can be started by simply bypassing the key slot/starting system and using

---

[1] Rob Stumpf, *How Thieves Are Stealing Hyundais and Kias with Just a USB Cable,* DRIVE (Aug. 2, 2022, 3:28 PM), https://www.thedrive.com/news/how thieves-arestealing-hyundais-and-kias-with-just-a-usb-cable; see also Joe Barrett, Police, *Car Owners Wrestle with Growing Thefts of Kias, Hyundais,* WALL. ST. J.

11

COMPLAINT FOR DAMAGES

a common USB cable (or any other similarly shaped object) to activate the engine and achieve both forward self-mobility and steering. Upon information and belief, at this point, the USB cable can be removed without deactivating the engine.

54. The Subject Vehicles do not contain starting systems with anti-theft features or design elements that would prevent forward self-mobility and steering when the key is removed from the starting system, as required by FMVSS 114.

55. Upon information and belief, the Defendants also made representations on their vehicles and/or in product literature related to the vehicles affirmatively representing that the vehicles conformed to all applicable USA federal motor vehicle theft prevention standards in effect on the date of manufacture, though this was not true.

56. If the Subject Vehicles had been manufactured in compliance with FMVSS 114, as required under federal law, they would not have been stolen with such frequency because, without a key, the engine would not start nor would forward self-mobility or steering be achieved.

57. In marketing materials, Defendants often advertised that higher-end trim packages came with a "push button start" feature rather than a traditional turn-key ignition. However, Defendants did not inform consumers that the Subject Vehicles were being sold without mandatory anti-theft protection required by the federal government to safeguard life and property, whether in the form of an immobilizer or otherwise.

58. When Defendants did disclose the lack of an immobilizer in lower-end trim packages, the disclosure was often made in a detailed trim packages comparison chart that consumers generally do not receive, read and/or understand. Such disclosures merely listed "immobilizer" without explaining what it does, that it is an anti-theft device intended to satisfy federal safety regulations, or that the lack of an immobilizer greatly increased the risk of vehicle thefts.

59. Defendants long have known the anti-theft and security benefits offered by immobilizers, as is evidenced by the fact that Defendants have incorporated immobilizers as standard technology in select higher-end models and as a feature in higher-end trim packages on other models. Defendants have simply refused to meet the standard of care established by their competitors, which installed immobilizers as standard technology on all their vehicles.

60. Kia's knowledge of the efficacy of immobilizers in preventing vehicle theft is further evidenced by the fact that, as early as 2007, Kia sought to add an immobilizer to its Amanti model.[2] In petitioning the federal government for an exemption to certain parts-making requirements of the Theft Prevention Standard (49 C.F.R. part 51), Kia represented that immobilizers had reduced the rates of vehicle thefts on other vehicle models by between 58 and 80 percent.[3]

61. Hyundai's knowledge of the efficacy of immobilizers in preventing vehicle theft is also evidenced by the fact that, as early as 2007, Hyundai sought to add an immobilizer to its Azera model.[4] In petitioning the federal government for an exemption to certain parts-making requirements of the Theft Prevention Standard (49 C.F.R. part 51), Hyundai represented that immobilizers had reduced the rates of vehicle thefts on other vehicle models by between 58 and 80 percent.[5]

62. Upon information and belief, Defendants have also known of the unusually high rate of thefts experienced by Subject Vehicles for many years,

---

[2] See Petition for Exemption from the Vehicle Theft Prevention Standard; Hyundai-Kia America Technical Center, Inc., 75 Fed. Reg. 1447, 1448 (Jan. 11, 2010).
[3] Id.
[4] See Petition for Exemption from the Vehicle Theft Prevention Standard; Hyundai-Kia America Technical Center, Inc., 72 Fed. Reg. 39661, 39661 (July 19, 2007).
[5] Id. at 39662.

through scores of customer complaints relayed directly, through their dealers, and/or through relevant government agencies. Yet, Defendants continued to sell dangerous and defective Vehicles that lack an immobilizer or other anti-theft feature or design element sufficient to satisfy FMVSS 114. Defendants failed to warn consumers of the severe risk of theft that resulted from the lack of compliance with FMVSS 114.

63. Only when the problem became too large to ignore did Defendants decide to introduce immobilizers as a standard feature in all new vehicles going forward and announced efforts toward a future software patch that supposedly may help reduce the rate of vehicle thefts in at least some Subject Vehicles. But the Plaintiffs remain on the hook for all damages and expenses resulting from Defendants' wrongful actions.

64. Plaintiffs issue and underwrite policies of automobile and property insurance.

65. The Subject Vehicles' noncompliance with FMVSS 114 caused Plaintiffs' insureds to suffer property damage, including the loss of use thereof and other related damages. As a result, Plaintiffs' insureds made claims under policies of insurance held with the Plaintiffs which were investigated and paid by Plaintiffs to its insureds per the applicable policy terms.

66. By virtue of its claim payments for amounts in excess of this Court's jurisdiction, Plaintiffs are now legally, equitably, and contractually subrogated to the rights, interests and claims of its insureds against all responsible third parties, including the Defendants herein, and have also incurred, and will continue to incur, damages in its own right.

## COUNT I
## BREACH OF WARRANTY

67. Plaintiffs incorporate by reference each preceding and succeeding

paragraph as though fully set forth at length herein.

68. Plaintiffs are informed and believe and thereupon allege that at the time of its insureds' purchases of the Subject Vehicles from the Defendants and each of them, said Defendants expressly and impliedly warranted that the Subject Vehicles would be free of defects; would be safe for their intended use and would be manufactured, designed, assembled and offered to the Insureds as merchantable and fit for the ordinary purposes for which they were sold. However, the Subject Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, *inter alia,* the defective Subject Vehicles lacked any anti-theft features or design elements to provide an adequate theft deterrent, or sufficient to satisfy FMVSS 114, resulting in a severe and highly dangerous risk of vehicle theft. Therefore, the Subject Vehicles were not fit for their particular purpose of providing safe and reliable transportation.

69. Defendants' warranties were designed and intended for the benefit of the Plaintiffs' insureds as ultimate consumers of the Subject Vehicles.

70. Plaintiffs' insureds relied on the existence and length of the implied warranties in deciding whether to purchase or lease the Subject Vehicles.

71. Contrary to the applicable express and implied warranties, the Subject Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs' insureds with reliable, durable, and safe transportation. Instead, the Subject Vehicles suffer from a defective design(s) and/or manufacturing defect(s) that render them vulnerable to an abnormally high risk of theft.

72. Defendants' actions, as complained of herein, breached the implied and/or express warranties that the Subject Vehicles were of merchantable quality and fit for such use.

73. As a direct and proximate result of Defendants' breach of their express and/or implied warranties, Plaintiffs' insureds suffered property damage, including the loss of use thereof, causing them to sustain damages for which the Defendants and each of them are liable.

## COUNT II
## NEGLIGENCE

74. Plaintiffs incorporate by reference each preceding and succeeding paragraph as if fully set forth at length herein.

75. Defendants manufactured, distributed and sold the Subject Vehicles.

76. Defendants violated applicable industry standards and otherwise failed to exercise reasonable care in connection with their manufacture, distribution and sale of the Subject Vehicles.

77. Further, Defendants made negligent misrepresentations to Plaintiffs' insureds concerning the safety, quality, and legal compliance of the Subject Vehicles that were not true or reasonable to believe and which they intended Plaintiffs' insureds to rely upon, and Plaintiffs insureds did reasonably rely upon these misrepresentations.

78. The Defendants' violation of their duties under applicable law included their negligent misrepresentations, and failure to comply with federal regulatory requirements to equip their vehicles with mandatory anti-theft protection that complies with the requirements of FMVSS 114, as a result whereof Plaintiffs' insureds suffered property damage, including the loss of use thereof, together with other damages for which the Defendants are liable.

## COUNT III
## NEGLIGENT FAILURE TO WARN

79. Plaintiffs incorporate by reference each preceding and succeeding paragraph as if fully set forth at length herein.

80. Defendants manufactured, distributed, and sold the Subject Vehicles.

81. The Subject Vehicles sold to Plaintiffs and Plaintiffs' insureds insureds:

    i. were not merchantable;

    ii. were not reasonably suited for the intended use for which they were sold; and

    iii. were in defective and unreasonably dangerous condition at the time of sale, by reason of the design of the Subject Vehicles.

82. Defendants owed the Plaintiffs' insureds a duty to warn with respect to dangers and risks associated with the ordinary and foreseeable use of the Subject Vehicles, particularly when such risks arose from latent and hidden defects of design that could not be detected by the Plaintiffs' insureds in the exercise of any reasonable care.

83. At all relevant times, including at the time of sale, Defendants knew that the Subject Vehicles were defective because the lack of an immobilizer or other anti-theft features or design elements sufficient to comply with FMVSS 114 would create a dangerous risk of vehicle theft, a risk to the safety of consumers and the public, and a risk of property damage and loss.

84. Defendants breached their duty owed to the Plaintiffs' insureds by completely failing to provide them with any warnings with respect to the dangers and risks of vehicle thefts and harm to consumers, the public, and property directly resulting from the design of the Subject Vehicles, including the lack of anti-theft features and/or design elements that complied with FMVSS 114.

85. The failure to warn Plaintiffs' insureds of the dangers and risks caused by noncompliance with FMVSS 114 was unreasonable, and Defendants' failure to warn was the result of a lack of due care and ordinary diligence.

86. Defendants' failure to warn Plaintiffs' insureds regarding the

defective and unreasonably dangerous condition of the Subject Vehicles proximately caused damage to the Plaintiffs' insureds resulting from vehicle thefts.

87. Defendants are liable for negligent failure to warn in tort for the damages caused by the Subject Vehicles.

88. Defendants owe a duty to consumers not to sell dangerous products that create severe risks of vehicle theft, property damage, and harm to the safety of consumers and the public, and to warn consumers of such risks. This duty arises under applicable law and is independent of any contractual obligation.

89. As a direct and proximate result of Defendants' negligent failure to warn Plaintiffs' insureds suffered property damage, including the loss of use thereof, and other damages for which Defendants, and each of them, are liable.

## COUNT IV
## UNJUST ENRICHMENT

90. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

91. Plaintiffs' insureds conferred monetary benefits upon the Defendants when the purchased or leased the Subject Vehicles.

92. The Defendants were aware of and possessed knowledge of said monetary benefits.

93. The Defendants charged and received from Plaintiffs' insureds the benefit of a higher price for the Subject Vehicles, in light of the failure of the Subject Vehicles to comply with FMVSS 114, the increased risk of vehicle theft, and any of the Defendants' wrongful acts or omissions to act.

94. The Defendants have continued to be unjustly enriched at the expense of Plaintiffs' insureds, and their retention of this benefit is inequitable.

95. Plaintiffs seek all available equitable relief, including but not limited to restitution in the amount of the benefit conferred on the Defendants as a result

of their wrongful acts or omissions to act.

# COUNT V

## VIOLATIONS OF THE CALIFORNIA SONG-BEVERLY ACT; CAL. CIV. CODE §§ 1791 *ET SEQ.*

96. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

97. For the purposes of this Count VI only, the definition of "Subject Vehicles" is restricted to those vehicles which were sold to Plaintiffs' insureds within the State of California.

98. At all relevant times, the Defendants were manufactures, distributors, warrantors, and sellers of the Subject Vehicles, and they knew or should have known of the specific use for which the Subject Vehicles were purchased.

99. Defendants provided Plaintiffs' insureds with the implied warranties that the vehicles were merchantable and fit for the ordinary purposes for which the vehicles were sold.

100. The Subject Vehicles were not merchantable or fit for their ordinary purpose because they contained an inherent defective condition at the time of sale as a result of their failure to contain sufficient or adequate anti-theft or safety devices.

101. The Defendants' actions or omissions to act, as complained-of herein, breached the implied warranties that the vehicles were merchantable and fit for their ordinary purpose in violation of California Civil Code §§ 1792 and 179.1.

102. As a direct and proximate result of the Defendants' breach of their implied warranties, Plaintiffs' insureds suffered property damage, including the loss of use thereof and causing other related damages.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury on all claims for which a jury trial is authorized.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against all Defendants and each of them as set forth below.

    a. For payment to the Plaintiffs for reimbursement for all damages resulting from the replacement or repair of the defective products, in an amount to be proven at trial;

    b. For payment to the Plaintiffs of all damages resulting from property damage caused by the Defendants' defective products, in an amount to be proven at trial;

    c. For interest as provided by law, including but not limited to pre-judgment and post-judgment interest as provided by rule or statute;

    d. For restitution and award of reasonable attorneys' fees and costs, as authorized by law, and

    e. For such other and further relief as this Court may deem just, equitable, or proper.

Dated: June 5, 2023        **GROTEFELD HOFFMANN, LLP**

/s/ Adam M. Romney
Adam M. Romney
*Attorneys for Plaintiffs*